In the first case, Rockhill Insurance v. CFI-Global Fisheries. May it please the court, Alan Bradshaw on behalf of CFI. I'm here with Tom Bursick, who is the counsel for heirloom. I would like to reserve three minutes if I can manage to do that. The issue, the coverage issue before the court is whether a professional liability insurance policy provides coverage for money damages awarded in arbitration as a result of an insured's negligent design of professional, of a fishery restoration project. The district court agreed with the policyholder on the meaning of the language within CFI's professional liability policy with a single exception. That exception, however, eviscerated the coverage provided by that policy for professional design services and for money judgments without the need for property damage and bodily injury as expressly covered in the policy. That ruling should be reversed and meaning restored to this professional liability policy and thousands of similar professional liability policies issued to design professionals such as architects, engineers, and consultants. The district court's ruling should be reversed because the court failed to apply fundamental rules of construction for interpreting an insurance policy. So this is an errors and omissions policy, essentially under the professional liability coverage? It is a professional liability policy. Is it essentially an errors and omissions policy? It is what we professionals would call an E&O. Exactly. And who are the professionals that are insured under that endorsement? CFI. CFI is not a professional. CFI is a corporation, right? That's true. Who are the professionals? The principal of CFI is an individual who is a design professional involved in fishery enhancements. What are his degrees or licenses? He doesn't have degrees or licenses, but the policy doesn't require that. Just a second. So we have a professional covered under a professional errors and omissions policy that does not have a degree, he does not have a license, and how many people work under him? It is essentially a small operation. There are three or four workers, and he is a design professional. He does have experience and credentials in designing fisheries. All right. We'll get to that in my question, but I just kind of wanted to know a little bit about who these people are because the policy spoke about professionals either consulting, doing their professional work, and as I understood, you were hanging your hat on the consulting part of that? That's correct, Your Honor. Who did they consult with? Heirloom. They have a contract. Well, they didn't consult with Heirloom. They had a design-build contract with Heirloom. That's right. And so typically, they weren't doing consulting work. They were doing design work. They were doing both design and CFI was hired to do both the design and the build. And they were underwritten by Rockhill as a consulting professional. These policies are issued not just to architects and engineers. They have a whole line of environmental consultants who are underwritten. This is called an environmental program. I understand, but typically when a professional, let's say a lawyer, needs to consult, he either is consulting with another professional or he is seeking consulting services, maybe the services of a CPA or a doctor or some other professional in the normal parlance of the word consult. Here, basically, what he was doing is designing. That's right. And in this unique industry, which is fishery enhancement, where you're dealing with issues like providing the proper amount of fish food, redesigning the river so that it is synthetically pleasing, those are consulting services that are provided by individuals who have that expertise. But it's not something you go to school for. These are design services. That's right. Right? Right. That's what they were doing. They weren't purporting to consult. They were purporting to design. They were consulting with Heirloom because they were providing design services as well as construction. Both. The contract required both. The design build, yeah. All right. And the CFI is named insured? Yes. Yeah. And that's how it was underwritten. Basically, then, what they proceeded to do is design a stream enhancement project along the stream. That's correct. And every time it flooded, it washed all the work out. That's correct. And so they sought insurance on which occasion? They sought insurance with respect to the arbitration that was brought by Heirloom for which they obtained approximately $900,000 judgment against my client for their professional negligence in the design. The design, they presented a testimony from another consulting individual, Mr. Roskin, who indicated that that design would have failed under his standards of professionalism and that it was, that's what resulted in the failure of the fishery design. The rules of construction that are critical here are that single word. One last question. So there was two types of work on this project. One was the design work. The other was the build work, which is the actual construction. Right. And when the policies excluded your work, which of your work do you claim was excluded? The construction work. The build part of it? The build part of it. The construction work. And not the design part of it? Not the design part of it. All right. Thank you. And if you look at the first rule of construction that the court misapplied is that individual words within an exclusion are not to be given a dictionary broad definition. This court decided the Pompa case applying Colorado law and specifically recognized, contrary to what the district court said when it made the statement that words within an exclusion cannot be interpreted in multiple fashions. The Pompa case stands for exactly the opposite of that. The words are to be judged in context. You are to look at the surrounding words and you are to evaluate based upon how it fits within the policy and how that word is used in that particular exclusion. And that's not what the district court did. The district court also fundamentally read out of the policy both the subject matter and the purpose of exclusion M, which is faulty workmanship. And that exclusion is really the key to your case? Absolutely. That faulty workmanship exclusion, literally what Rock Hill has done is read those words out of the policy. So they read the exclusion as if it now says this insurance does not apply to based upon arising out of or for any lost cost or expense. It's nonsensical. If you look at faulty workmanship, you have to give it meaning. It defines the purpose and scope. And if you look at all of the words that surround faulty workmanship, faulty workmanship defines and restricts the words your work. Your work is defined as including things like work, materials, parts, operations, equipment. All of those words, faulty workmanship, material, works, parts, equipment can be read and harmonized together. They all denote physical construction, not professional design. And so the only way to harmonize those words and read the language consistent in context is to read your work as referencing construction work. In addition, the Colorado courts apply the reasonable expectation doctrine. And they apply it as a tool of interpretation even if there is, regardless of whether there is ambiguity in the policy. The district court makes detailed findings. Can I clarify? Sure. If we agree with you and we think the language is plain and it doesn't exclude coverage here, do we need to talk about the reasonable expectation doctrine? It is a tool of interpretation that's available to get you to that result where coverage is provided. It is simply another one of these construction tools that's available. And the district court found that he had, in essence, eviscerated the policy and ruled contrary to the reasonable expectations of the insured. And the district court justified that because it made the argument that this was a one-off. That this was a policy that uniquely excluded your work. That's not true. All of the treatises cited by the district court, cited by Rockhill, all make clear that any time you issue a policy to a design professional, you exclude faulty workmanship. You exclude the build part of the project from coverage under the professional design coverage. Could you address, in time that you have, again, this is assuming we would agree with you. Can you address your common law, bad faith claims, and whether or not you've incurred any damages? I think that's what the district court relied upon. Are there any summary judgments on that? Yes. I'd be happy to, Your Honor. The issue is that the district court found that CFI presented inadequate evidence of causation testimony with respect to damages. With respect to one particular type of damage, which is business laws. That ruling needs to be reversed for three reasons. The first reason is because we brought a claim for statutory damages. And under that claim, if there has been a delay or a denial of insurance benefits, we recover statutory damages and there is no need for causation. We've cited those cases. Right, but that's different from the common law claim. That's true. But the district court overlooked all of that and granted summary judgment on the statutory claim. Rockhill has not opposed that. They've essentially conceded that summary judgment must be reversed on the statutory claim. Are you conceding that summary judgment was appropriate on the common law claim? No. That's what I'm asking about. Okay. The next two items, I will respond to that. So there are two additional reasons why on the common law claim we get to recover or proceed to trial and summary judgment must be reversed. The first is that we brought a claim for failure to settle. And actually we have fairly outrageous conduct in terms of what happened here. Rockhill recognized design coverage throughout the entire pendency of the case. They made a $15,000 offer to settle, ignored the recommendations of defense counsel. Okay, so the point is that as the Wint Treatise recognizes, in a duty to settle case, if the claimant has offered to settle for policy limits, causation is indisputable. We're entitled to pursue damages related to the failure to settle the case. But the district court said you needed to show actual business loss as a result of this. And just saying, well, we were doing well and then this happened and then we were not doing well is not enough. That's correct. But what the district court didn't address was the duty to settle. The district court looked at simply the damages related to business losses. And those could be measured differently than the duty to settle. The duty to settle could be measured, for example, if the court were to find... Well, don't you have to show damages for a common law bad faith recovery? We do. But we can show them with respect to the duty to settle based upon the fact that the case was not settled and we now have a $900,000 judgment against my client. And if it had been settled early when it should have been, that judgment would not have been there or the amount of liability would have been reduced. In addition, just straight up in terms of the district court's analysis, the evidence here was sufficient. Colorado cases are clear that an owner's testimony with respect to causation and damages to business losses is appropriate and competent evidence and can establish the fact of loss. Here we have literally a 10-year history of uninterrupted income to my client of a million dollars a year that literally in 2017 went to zero. And the reason it went to zero was because they were spending all of 2016 fighting this arbitration and they had lost all of the referrals. And there was evidence of that before the district court? There was. And the owner had testified that what happened was most of his referrals come from real estate brokers who were working with heirloom. They no longer referred cases because this case did not get resolved. His business went from a million dollars a year to zero immediately. And under the cases that we cite, the Hendrick case and the Boardwalk Apartments case, that timing issue is important and can serve as a basis to demonstrate causation. And you're out of time. Thank you. Good morning. My name is Gala Reppes and together with my partner, Adam Fleischer, we represent the Appleby Rockhill Insurance Company. This case is actually really simple. And the basic precept that overarches this entire case is that this professional liability policy does not cover the cost to complete the insurance work. That is a basic precept that makes this case really simple. And it's not just argument. Well, they did complete their work. I know that's repeatedly argued in your briefing. But they did repeat. They did complete their work and again completed their work and again completed their work. So I don't understand that argument. But it's not just the completion of the work. It's the completion of the work in conformance with the specifications that heirloom gave CFI. It's not just that you can go and try and do it and fail and say, well, I tried and I'm done. No, you have to. Completion means not only doing the work but doing it to the satisfaction of heirloom. And heirloom wasn't satisfied. You mean the workmanship? The workmanship. Exactly right. But what about the design? It's everything. Separate from workmanship. And that's the part that bothers me about the district court's opinion is, as counsel just stated, district court completely read out the words faulty workmanship from the exclusion M. This insurance does not apply to, and the heading is, faulty workmanship. And then it goes right into the sentence, based upon the rising out of. You can't read the heading out of the exclusion. How could you do that? I agree with you. We can't read the heading out of the exclusion. But the district court seemed to think that because it couldn't read that heading in, that was a basis for its decision. The design was covered. It wasn't covered. But the district court got to the right result. It didn't quite get all the reasoning correct. Reading out those two important words, which was the basis for the exclusion. The fundamental mistaken premise of the district court's understanding of, you know, you basically have to ignore faulty workmanship, is that faulty workmanship must mean construction. That's not what it means at all. You have to read it in the context of the text that follows. In the text that follows, it says, faulty workmanship arising out of cost to repair and replace your work. Workmanship and your work have to be read together. And go on and read the next sentence, which talks about materials, parts, labor, or equipment. That doesn't sound like design to me. It sounds like building. Yeah, but you also have to look at the definition of your work. And your work is broadly defined to include your work, your operations, and representations about your work. There is nothing in there that takes the scope of CFI's work, carves it up, and says, oh, we really only meant to apply to this facet of your work and not that facet. The words faulty workmanship, if you restrict workmanship to the actual construction work. But there's nothing in the policy that indicates there was any intent. Definition of workmanship, just a dictionary definition of workmanship. But we don't need to go to dictionary definition of workmanship. I mean, work and workmanship are not some sort of mysterious concept that we need to be consulting dictionaries. We just need to look at the defined term, your work. But you don't look at your work without the words material, parts, labor, and equipment. It's everything. Right. If you define your work as comprehensively as you do to exclude design work, what was being insured and what was paid for? Which is nothing, right? False. That is not true. Well, what was insured? Under your theory of the case. So what was excluded was a very narrow category of damages that result from faulty workmanship, which is the cost of repairing and replacing the work. No, no, no. That's what was not insured. What was insured? So I'm drawing the line between that and everything else that might arise from the insured's faulty workmanship. Any other type of damage? Other than design? It's not. This is the mistaken premise of the appellant's argument. The policy doesn't look at just the conduct. The policy also looks at the resulting damages. So it's whatever the insured is doing, whatever the scope of their work is, if it results in a certain category of damages, you look at those damages and you say, are those covered? And if faulty workmanship results in a category of damages that's not excluded. Now, remember, damages is brought up. I'm sorry. You've got to back down a little for me on this one. What is insured? The design aspect of the work or the construct aspect of the work? Professional services. Professional services is defined as anything the insured is doing for a third party for a fee. So that's everything the insured is doing. So theoretically, that covers everything. Theoretically, everything. And then there are certain exclusions that apply. And remember, the scope of the work wasn't limited to just design and construction. CFI was doing a host of things. They were interfacing with the Corps of Engineers. They were selecting and identifying and organizing materials. It wasn't just design and construction. So you can't limit it to just those things. But this was a professional liability policy. What do you think they were wanting to insure? But recall, this is a little bit different from a professional liability policy that insures somebody like an architect or an engineer who does exclusively design services. This is a professional liability policy issued to a contractor. And a contractor is doing a host of things. The scope of their work is broader than an architect or an engineer. So the scope of the coverage is therefore broader. The scope of the coverage is broader because it covers everything that the insured is doing in its professional capacity. And then there are certain categories of damages that may or may not arise. You know, you might have been able to persuade Judge Moore, on this Judge Moore. But you're not persuading at least this judge. Because I'm hearing a lot of fancy words, but I'm not hearing any answers. Was the design aspect of this contract covered? Yes. Design, build, everything. When the design failed, allegedly because of negligence, did you cover and pay for the damages? It depends on what the nature of the damages are. No. Did you cover or pay for the damages? The answer is no. We don't cover repair or replacement costs. Correct. Those are excluded. But that's because of the nature of the damages. Can I give you an example of what might be covered? Right. So let's take the facts of this case. CFI constructs a fishery, doesn't do it correctly. It fails. And not only does the scope of the work fail, the actual project fail. But let's say they cause the neighboring property to flood. Okay? So we would pay what would not be excluded and what we would potentially pay as damages are the cost to repair the property owner's home. So you're saying this coverage would only apply if a third party is injured? That's one example. It's not like a CGL policy where it's only certain types. Because there is a CGL policy here, too. That's correct. There's a CGL policy. So I think maybe that's the policy that covers the construction. Well, we exclude it. We deny coverage under the CGL part because those were not involved for various reasons under various exclusions, but among which was the professional services exclusion. And nobody has disputed that. I mean, CFI has never disputed that our coverage denial under the CGL. So that's not an issue here. But I only give you that as an example. I'm not saying that third-party property damage is the only type of damage that would be covered. Any kind of economic damage, bodily injury, property damage, yes, but also economic losses that would arise from anything outside the scope of CFI's bad work. Again, to third parties? Is that what you're requiring? To anybody. Just a third party? A third party. It wouldn't cover what's just simply the cost to make CFI's project work and to be to the satisfaction of Heirloom. It just so happens that in this particular case, those were the only damages that Heirloom saw. And those were the only damages that Heirloom was awarded. The neighboring property owner, their property didn't flood. Nobody got injured. If it had, we would have a very different case. And we would pay those, potentially, those damages. Absolutely. But we still wouldn't pay the cost. Did the district court go off on this third-party concept at all? The district court gave the example, to illustrate the example, that this is not illusory coverage. I mean, the district court thought that, well, maybe this is a bad deal because this is very strange. But he did say it's not illusory coverage because there are certain things that would not be excluded if the design or the construction or whatever aspect of CFI's work failed. You just sort of vaguely said that, that maybe somewhere out there there's something that's covered. There is something that's covered. I mean, that happens. That's not, you know, sort of a made-up or strange example. I only give you that as an example, that the neighboring property floods or somebody gets injured or, you know, any type of those things we would potentially cover. So it's not a strange result to say that this professional liability policy doesn't cover the cost to repair or replace CFI's bad work. Is this a one-off contract, an unusual provision? Absolutely not. Commonplace. There are plenty of policies. And always interpreted as this district court interpreted it? Well, you see it all the time in the CGL context. I mean, there's tons of cases saying that. Right, that we're not there. Right, exactly. But the concept is the same. The professional liability policy kind of gets at it in a bit of a different way, but the end result is the same. The policy is not going to cover the cost to prepare or replace CFI's work. Remember, the policy terms and the conditions all put together reflect a very careful allocation of risk. I mean, that's why you have these terms and conditions. So if we had an architect here and the architect designs a building and the building collapses, is the owner of the building remunerated for claims against the architect for negligence in the design of the building? So let me just make sure I understand your question. If we insured an architect and the design was bad and the building collapsed, that would be outside the scope of the defined work. So the architect is not compensated and the building owner is not compensated. Well, wait, wait, wait, wait. Of course it depends. I mean, policies that are issued to architects and insurers, I want to be very careful about, it would depend on what the insurer says. Well, that's why I was trying to go there at the beginning, trying to figure out who the professionals were that were being insured. Well, I mean, this is a contractor. It's not an engineer or an architect. So those policies could be very different. Of course, everything depends on the policy terms. Well, this individual is a designer, right, designed this project. CFI. They're a designer. They're a builder. They do many things. Don't just call them a builder because that's not what they are. No, no. And no, the scope of their work is very, very broad. They do lots of things. So let's say, for example, that the only thing that CFI was hired to do was to design the fishery. If the fishery fails, then we would potentially cover that in that instance because that is outside. Just like you would if the architect's design failed, you'd cover the building? If that is outside the scope of their work, yes. If the architect had nothing to do with the construction of the building, that wasn't what they were hired to do. It was strictly one facet. But it was the design that was the cause of the problem in the collapse of the building, not the construction. Right, and so if the building collapses, then that potentially covers that. But it's not going to cover the cost to redo the design, potentially. I mean, as I said, it would depend on the specific language. So the demarcation here is between what was the insured hired to do. We're not going to cover the cost to redo their work. That's their risk. That's the cost of doing business. I mean, insurers eat those costs all the time. It's everything else outside the scope of their work if it fails. It just so happens here that CFI's scope of work was broad, and all those things fail. After all of this discussion about these terms and understanding their meanings, perhaps it's correct to conclude that the exclusion M is ambiguous. And you know what happens then. There's no ambiguity here. Your work is clear as a bell, and what that means, and workmanship, and faulty workmanship. It's all very clear. Absolutely, but that's the thing. You can't construe it in a vacuum. You do have to construe it in the context of the policy as a whole. And there are multiple places in the policy. Get at this idea that an insurance policy, this professional liability policy, is not a performance fund. And perhaps one salient example of that is you look at Exclusion J, and it says we don't cover the costs of your failure to get a performance fund. I mean, that makes crystal clear that this product is not a performance fund. So to use the vernacular, what you're saying is that you cover the design aspect, but not the construction or rebuilding aspect of this liability? In this instance, no. We cover everything that CFI was contracted to do. But then you exclude it. You cover it, but then you exclude the design and construction. No, no, no. Let me be precise. We cover the professional services. We exclude a category of damages that result from the faulty performance of those professional services. And we don't exclude a whole other swath of other types of damages that may result. You have to look at not only the conduct, but the damages, the resulting damages. That's what defines coverage. Thank you. And for all these reasons, because this is not a performance fund and does not cover the cost of completion, we respectfully request that the Court affirm the judgment. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted.